UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                                                                          Bankruptcy No. 09-30350
                                                                                                Chapter 7
Grant A. Kendall and
Andrea L. Kendall,

                Debtors.
_____/

Kip M. Kaler, as Bankruptcy Trustee
for Grant A. Kendall and Andrea L.
Kendall,

                Plaintiff,

          vs.                                                                  Adversary No. 09-7024

Able Debt Settlement, Inc.,

                Defendant.
_____/

**MEMORANDUM AND ORDER**

     Kip M. Kaler, the bankruptcy trustee in this case, initiated this adversary proceeding by complaint filed August 10, 2009, seeking a determination that payments Debtors Grant and Andrea Kendall made to Defendant Able Debt Settlement, Inc. (ADSI) totaling $1,703.87 constitute a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B). By amended complaint filed January 25, 2010, the trustee further asserts that ADSI attempted to provide services to Debtors that are barred by state law under N.D.C.C. § 13-06-02. ADSI filed an answer on September 9, 2009, and an amended answer on February 3, 2010, denying the allegations. The matter was tried on May 5, 2010. The following constitutes the Court's findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

In 2008, Debtors found themselves in financial trouble.  They consulted The Village for credit counseling, but Debtors could not afford The Village's proposed plan which would have required a $748 monthly payment.  Debtors also considered bankruptcy.  They had children who were going to college, however, and Debtors feared that they would not be able to cosign for their children's educational loans if they filed for bankruptcy.

Andrea Kendall contacted ADSI through the internet.  After reading the information on ADSI's website, Andrea Kendall determined that ADSI might provide a plan for dealing with their creditors that would be manageable, and she sent an email through the website.

Jason Irwin called Andrea Kendall in response to her email to enroll Debtors in ADSI's program.  Irwin emailed her documents, and she filled them out with information including creditors, amounts of debt, and monthly income and expenses.  The form she filled out indicated a monthly disposable income of negative $158.00.  She did not have a conversation with Irwin as to how they would fund the plan in light of the household deficit, but she did testify that she thought she could cut expenses.

Next, ADSI sent a service agreement for Debtors to sign. This service agreement is dated February 2, 2008, and Debtors signed it on February 13, 2008.  Irwin is not mentioned in the service agreement, and Debtors did not sign any separate contract with Irwin.  Andrea Kendall testified that Irwin never told Debtors he was not an ADSI employee nor did she realize it on her own.  Debtors faxed the service agreement back to ADSI on February 14, 2008, and they never spoke to Irwin again.

The service agreement states that ADSI does not provide legal advice. It also states that "ADSI does not collect any payments on behalf of the CLIENT to be distributed to the CLIENT's Creditors. ADSI is not responsible for making payments to CLIENT's Creditors nor are any funds collected by ADSI for the purpose of paying any third party representative of CLIENT Creditors." It also states that "ADSI does not manage the distribution or payment on any of the CLIENT's accounts." In the event of a settlement, the agreement provides that the client will make all settlement payments directly to the creditor. It also contains the following disclaimer:

> CLIENT acknowledges that ADSI has made no guarantees, warranties, representations or predictions, express or implied, about the outcome of its services. CLIENT understands that each situation is unique and that individual results may vary. The objective of this debt settlement plan is to improve the financial condition of the CLIENT. Any reduction in the original balance due or payment arrangement made on any account is made by CLIENT at their sole discretion. ADSI does not warrant or represent the acceptability of the arrangements between the CLIENT and the Creditor.

ADSI did not ask for tax returns or ask how Debtors would fund their plan. Debtors simply told ADSI which creditors they wanted to enroll in the program, provided one statement for each creditor, and ADSI offered them a 60-month program whereby Debtors would pay $135 per month.[1] The Program Worksheet states that Phase 1 of the program included a $675 retainer fee paid over the first five months of the plan. Phase 2 included a service fee of $61.04 per month for 27 months. Phase 2 also contemplated Debtors starting a savings account and contributing $73.96 per month to pay creditors. Phase 3 involved Debtors contributing $135 per month to a savings account to pay creditors. ADSI estimated that Debtors would pay their creditors $5,776.86 on a debt of $22,125.15 and would pay ADSI a total service fee of $2,323.14.

---

[1] Andrea Kendall testified she had no idea how ADSI arrived at $135 per month as the payment amount.

Andrea Kendall wrote a notation on the Program Worksheet indicating Debtors thought they could put a total of $200 per month toward the program and that they wanted to include two additional creditors. ADSI sent a new Program Worksheet to Debtors that reflected these changes. Under the new program, Phase 1 included an $800 retainer fee paid over the first four months of the program. Phase 2 included a service fee of $100.93 for 24 months and contemplated Debtors contributing $99.07 per month to a savings account to pay creditors. According to the second Program Worksheet, Debtors would pay their creditors an estimated $8,777.72 on a debt of $26,852.32 and would pay ADSI a total service fee of $3,222.28.

Debtors signed an authorization for ADSI to automatically withdraw funds from their checking account each month. On February 25, 2008, Debtors made their first payment to ADSI in the amount of $200.00. They made subsequent $200.00 payments on March 25, April 25, and May 25. On June 25, 2008, the payment decreased to $100.93. Andrea Kendall testified that they were supposed to put the difference into a savings account to fund any settlements with creditors that ADSI reached on their behalf. Debtors started a savings account and put $300 into it over 4-6 months, but, after that, they did not have any money to put into it. She testified that ADSI never asked whether they established a savings account or checked up on their progress funding the account. Debtors continued to pay $100.93 on the 25th of each month through February 25, 2009.

Debtors received one communication from ADSI about a possible settlement with a creditor. The offer was to settle for $1,002.78 and was due on or before May 3, 2008. Debtors did not have the money to pay the settlement.

Debtors' financial situation got worse as time passed. They tried to talk to their creditors, but the creditors told Debtors they could not talk to them because they were enrolled in the program.

On June 16, 2008, Andrea Kendall sent ADSI a letter after Debtors received a summons and complaint related to one of their credit card debts. She testified that ADSI told her that they had contacted the creditor and that Debtors might need to seek legal counsel. She sent another correspondence on August 28, 2008, indicating that she did not understand what the documents from the credit card company meant and asking for assistance. The credit card company obtained two judgments against Debtors, and Debtors' wages were garnished in the fall of 2008.

Grant Kendall testified that he had one conversation with ADSI. After the judgment notices came, he called ADSI and spoke with a representative who said ADSI could not offer legal advice. He asked to speak to Irwin and was informed that Irwin did not work for ADSI. This is when Debtors first became aware that Irwin did not work for ADSI.

Ralph Lewis, the chief operating officer of ADSI, testified that Irwin works for Experience Financial, which is an affiliate of ADSI's but does not have common ownership, contracts or assets. ADSI publishes a "tool kit" to help practitioners like Irwin, and those practitioners bring clients to ADSI. Lewis explained that after a practitioner provides the analysis and budgeting for a client, ADSI implements the program because it has the resources to perform functions like creditor processing. Lewis testified that ADSI establishes special lines of communication with creditors that are not open to the general public.

Lewis testified that Debtors' monthly payment amounts were determined by Irwin. After Debtors were accepted into the program, ADSI sent notices to Debtors' creditors and informed them of Debtors' insolvency, program enrollment, and authorization. If Debtors were contacted by a creditor they thought they did not owe, ADSI filed a dispute with the creditor. Debtors forwarded notices they received from creditors to ADSI. Upon receipt of any information from Debtors, ADSI

5

logged the information into Debtors' log sheet indicating the time and nature of the correspondence and what response was provided. The response might have been a communication with Debtors or with a creditor. Lewis testified that the process is time intensive, and Debtors were not necessarily told about every communication ADSI made on their behalf. ADSI's log for Debtors is four pages and includes communications with Debtors and creditors by mail, fax, email and telephone.

By early 2009, Debtors' financial circumstances had continued to deteriorate. A child support payment of $600 per month was added to their obligations, and they did not have the money to continue with the ADSI program. On March 25, 2009, Debtors signed a notice of cancellation of the agreement with ADSI. ADSI sent Debtors an acknowledgment of their termination from the program that indicated Debtors paid ADSI service fees totaling $1,708.37.

Lewis testified that Debtors paid $854.00 in fees to ADSI, and the other portion of the $1,708.37 ADSI collected went to Experience Financial. Andrea Kendall testified that she did not know that any of their fees were going to anyone other than ADSI.

Debtors filed a voluntary Chapter 7 petition for bankruptcy relief on April 3, 2009.

## II.  CONCLUSIONS OF LAW

The trustee argues that Debtors' payments to ADSI are constructively fraudulent transfers under section 548 of the Bankruptcy Code and that ADSI's services are illegal under North Dakota law. The Court will address these arguments in turn.

A.	11 U.S.C. § 548(a)(1)(B)

Section 548 of the Bankruptcy Codes provides that the trustee may avoid a transfer made by a debtor within two years of the filing of a bankruptcy petition if the debtor received less than a

6

reasonably equivalent value in exchange for the transfer and the debtor was insolvent on the date the transfer was made. 11 U.S.C. § 548(a)(1)(B).[2]

There is no dispute that the transfers fell within two years of the filing of Debtors' bankruptcy petition and that Debtors were insolvent when the transfers at issue were made. The only issue is whether Debtors received less than a reasonably equivalent value in exchange for their payments to ADSI.

The concept of reasonably equivalent value is a means of determining if the debtor received a fair exchange in the marketplace for the goods transferred. Pummill v. Greensfelder Hemker & Gale (In re Richards & Conover Steel Co.), 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001). To determine whether Debtors received less than reasonably equivalent value in exchange for their payments, the Court must assess whether (1) value was given; (2) it was given in exchange for the transfers; and (3) what was transferred was reasonably equivalent to what was received. See Stalnaker v. Gratton (In re Rosen Auto Leasing, Inc.), 346 B.R. 798, 805 (B.A.P. 8th Cir. 2006).

---

[2] Section 548(a)(1)(B) provides in relevant part:

(a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –

* * *

(B) (I) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548(a)(1)(B).

As a preliminary matter, ADSI agues that the amount at issue is $854.18, not $1,708.37, because it shared the fees it collected equally with Irwin. The Court disagrees. Debtors believed that Irwin was an employee of ADSI until months into the program, the contract Debtors signed was with ADSI alone, and the acknowledgment of Debtors' termination from the program ADSI sent to Debtors indicated Debtors paid ADSI service fees totaling $1,708.37. The amount of the transfers at issue is therefore $1,708.37.

As to the issue of whether value was given, the Court finds that ADSI did indeed provide value. It collected Debtors' information regarding the creditors that Debtors wanted to enroll in the program. It contacted the creditors and worked to negotiate settlements with them. ADSI's log shows that it provided services to Debtors for approximately one year that Debtors were enrolled in the program. Although these services did not keep Debtors from ultimately having to file for bankruptcy or result in paying off any creditors, the services had value. Had Debtors been able to fund an account to pay any settlement offers ADSI negotiated on their behalf over the course of the plan, Debtors and their creditors would have received a benefit. See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.N.L, Inc.), 92 F.3d 139 (3rd Cir. 1996) ("So long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, we will find that value has been conferred."). The Court also finds that the value ADSI provided through its services was given in exchange for Debtors' payments.

The remaining question is whether the services provided by ADSI were reasonably equivalent to $1,708.37. Outside the foreclosure context, fair market value is the benchmark for determining reasonably equivalent value. Kaler v. Red River Commodities, Inc., (In re Sun Valley Products), 328 B.R. 147, 156 (Bankr. D.N.D. 2005). Whether a transfer is made in exchange for

8

reasonably equivalent value is a question of fact requiring the court to consider all factors bearing value in the marketplace. Id. Often there is nothing to consider beyond comparing the fair market value of what the debtor transferred against the fair market value of what the debtor received. Id. If the two values are reasonably similar, no fraudulent transfer occurred. Id. Other factors to be considered include the good faith of the parties and whether the transaction was an arm's length transaction between a willing buyer and a willing seller. Id. The court must examine the transaction at the time it was made and not with the benefit of hindsight. See Peltz v. Welsh, Carson, Anderson & Stowe VII, L.P. (In re Bridge Info. Sys., Inc.), 311 B.R. 781, 792 (Bankr. E.D. Mo. 2004). The trustee bears the burden of demonstrating, by a preponderance of the evidence, that the payments Debtors made were not in exchange for reasonably equivalent value. See Meeks v. Don Howard Charitable Remainder Trust (In re Southern Health Care of Ark., Inc.), 309 B.R. 314, 319 (B.A.P. 8th Cir. 2004).

The Program Worksheets clearly indicate what the cost of participation in the program would be to Debtors. The service agreement states that ADSI makes no guarantees about the outcome of its services. Andrea Kendall testified that she knew it was Debtors' responsibility to contribute to a savings account to fund any settlements. In other words, Debtors knew the cost, the requirements, and the risk of the program, and decided it was worth it. The agreement between Debtors and ADSI was an arm's length transaction between a willing buyer and a willing seller, it was entered into in good faith, and Debtors paid fair market value for ADSI's services. Accordingly, Debtors received a reasonably equivalent value for their $1,708.37.

9

B.     N.D.C.C. ch. 13-06

The trustee next alleges that ADSI's services are illegal in North Dakota. Section 13-06-02, N.D.C.C., prohibits companies from "debt adjusting" in the state of North Dakota: "Any person who engages in the business of debt adjusting, unless exempted under the provision of section 13-06-03, is guilty of a class A misdemeanor. N.D.C.C. § 13-06-02. Debt adjusting is defined in section 13-06-01:

> As used in this chapter, the following words and phrases have the following meaning, unless the context clearly indicates otherwise:
>
> 1. "Debt adjusting" means the making of a contract, express or implied, with a debtor whereby the debtor agrees to pay a certain amount of money or other thing of value periodically to the person engaged in the debt adjusting business who shall, for a consideration, distribute the same among certain specified creditors in accordance with a plan agreed upon. The term includes debt adjustment, budget counseling, debt management, or debt pooling service or the holding of oneself out, by words of similar import, as providing services to debtors in the management of their debts and contracting with the debtor for a fee to:
>
>    a.   Effect the adjustment, compromise, or discharge of any account, note, or other indebtedness, of the debtor; or
>
>    b.   Receive from the debtor and disburse to the debtor's creditors any money or other thing of value.
>
> 2. "Person" means an individual, corporation, limited liability company, partnership, trust, firm, association, or other legal entity.

N.D.C.C. § 13-06-01.

The trustee argues that the "or" in the second sentence of the definition of debt adjusting means that a person engages in debt adjusting whether or not that person receives money from the debtor and distributes the same to the debtor's creditors. The trustee's interpretation of the statute, however, would render a portion of the first sentence – that "debt adjusting" includes as a part of

10

its definition the distribution of money among creditors – inoperative.  The North Dakota Supreme Court has consistently held that statues must be construed to give effect to all their provisions, so that no part of a statute is rendered inoperative or superfluous.  See, e.g., Van Valkenburg v. T.E. (In re T.E.), 2008 N.D. 86, ¶ 6, 748 N.W.2d 677; see also N.D.C.C. § 1-02-38(2) ("In enacting a statute, it is presumed that . . . [t]he entire statute is intended to be effective.").  The Court declines the trustee's interpretation and concludes that the definition of "debt adjusting" is set forth in the first sentence of section 13-06-01, N.D.C.C., and includes the required element that the alleged debt adjuster receive money from the debtor and distribute that money to the debtor's creditors.  If the North Dakota legislature wants to prohibit services such as ADSI's, it may amend section 13-06-01 accordingly.  As it stands, ADSI is not engaged in "debt adjusting" under section 13-06-01because it does not distribute money to creditors.

The Court has considered all other arguments and deems them to be without merit.

For the foregoing reasons, the Complaint of Kip M. Kaler premised on 11 U.S.C. § 548 and N.D.C.C. § 13-02.1-04 is dismissed.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this July 14, 2010.

        **WILLIAM A. HILL, JUDGE**
        **U.S. BANKRUPTCY COURT**